## L. E. KNAPP v. W. I. FULLER AND FRANK E. SMITH.

### *Libel.*

1. In an action for a libel, where the language used is ambiguous or ironical, the plaintiff's acquaintances may state their understanding as to whom the libelous charge refers, and what it imputes.

2. The defendant, after suit was brought, published another article referring to the plaintiff by name. It was admissible to show the *animus*, the intention, in publishing the first article.

3. Also, what one of the defendants said, a few days after the first publication, manifesting a hostile feeling towards the plaintiff, was admissible.

ACTION for libel. Plea, general issue, with special matter in defence. Trial by jury, June Term, 1881, PIERPOINT, Ch. J., presiding. Verdict for the plaintiff to recover $200 damages.

The facts are stated in the opinion.

*McLeod*, for the defendants.

It was error to admit testimony as to what witness understood was imputed to the person referred to by the article. That was a question for the jury. 8 East, 427 ; 6 Term, 691.

*E. R. Hard*, for the plaintiff.

The testimony of Brooks and of Bailey as to whom they understood, from reading the libelous article, it referred to, and what offense was intended to be charged, was competent. 2 Greenl. Ev. s. 417 ; Abb. Tr. Ev. 664, 665 ; *Smith* v. *Miles*, 15 Vt. 245, 249. It was competent to show by Brooks that Smith, one of the defendants, and (as the testimony shows) the writer of the slanderous item was, at that time hostile to the plaintiff.

The fact of such hostility would bear more or less upon the question, *who* was referred to in the item, and also upon the question of *actual malice*.

The opinion of the court was delivered by

POWERS, J. This was an action for a libel predicated upon an article published by the defendants in the Addison County *Journal*, as follows :

" One day last week two of our citizens went to the residence of a farmer a short distance from the village on business, and on arriving there went to the door and rapped but received no response ; they rapped a second time and no response ; and a a third time with the same result. They then opened the door and walked in, and as they did so who should emerge from the bedroom but one of our prominent officials with a young lady of the house, who being enquired of as to the whereabouts of members of the family, said they were all absent but her. After some conversation our gay Lothario took his leave. Query : Was said official there on *probate* business ? Perhaps it would be in order for him to " rise and explain," as many of our people would like to be informed."

The plaintiff was allowed against the objection of the defendants to prove by his acquaintances who read the above article whom they understood it to refer to, and what they understood the charge imputed by it was ?

It is argued that this evidence could not be received until it had been shown that the witnesses had knowledge of the circumstances happening at or near the time of publication to which the article necessarily referred, and that they got their understanding as to the person referred to from their knowledge of these circumstances. It was not made quite clear in argument what scope counsel intended to give to the above proposition, but the tenor of the argument was that the reader of the publication, in making up his conclusion as to the person aimed at, must exclude from consideration personal information he might possess, drawn from sources not furnished by the article itself, or known to him otherwise and referred to by the article.

There is considerable conflict in the cases touching the admission of testimony of witnesses as to their understanding of alleged libelous language. The authorities are uniform that the meaning is a question for the jury, and the jury are to put themselves as nearly as may be in the shoes of the reader, and from his standpoint determine the character of the language. To determine

this question it is obvious that the language will be construed by the reader, not only with reference to all the facts and circumstances recited in the article itself, but also with reference to such other facts as the writer might reasonably expect to be within the present knowledge of the reader. If an article adopts terms or forms of expression which have a provincial meaning unlike their natural import, and are addressed to persons of the locality where such provincialisms are understood, the writer is bound to expect that his language will be read in its provincial sense.

If a person is known in a locality as having a nickname, or one given him by reason of some oddity of manner, peculiarity of gait or dress, or some official character, and the article refers or may refer to such name or character instead of the true name, all persons reading an article referring to somebody under such name, and knowing who bore the name, would feel well assured respecting the person alluded to. Such name or character are but an *alias* for the person's true name.

But it would not do to say that the jury are presumed to know all the facts known by the reader. The reader having an intimate acquaintance with the person in question, both under his true name and in his official character, can apply an ambiguous reference to its proper object at once. The jury may be, and, practically speaking, naturally would be, a class of persons not intimately acquainted with these facts. They could not stand in the shoes of the witness. And to lay before them the naked fact that a person had some peculiarities that possibly mark him as the one referred to in the article is forcing the jury into [the region of conjecture.

In cases where the mental condition of a person is in question, a non-expert witness may detail facts from which the jury may judge whether the person is insane. He may go further and tell the jury what his opinion is as to his insanity. The jury may add this opinion to the facts detailed, and on the whole form their opinion. There are many cases where the distinction between opinion or understanding and fact is quite shadowy and undefinable, and oftentimes a recital of facts is tantamount to the expression of opinion. The witness familiar with the facts can group

and combine them into a conclusion that has some value, while the jury less familiar with them will be more likely to give them their proper force if the witness states his conclusion. No danger can arise from this evidence when a cross-examination is open to the adverse party. If the language of the article is unambiguous, there is no room for evidence of the witness' understanding of its meaning. But if it is ambiguous or ironical, if it is the soft impeachment of the coward who is afraid to call men and things by their right names, but prefers by innuendo and insinuation to villify his victim, it is a case where acquaintances may state their understanding of the language made use of. As Abbott, Ch. J., *Bourke* v. *Warren*, 2 C. & P. 307, says : " It is not necessary that all the world should understand the libel ; it is sufficient if those who know the plaintiff can make out that he is the person meant."

The doctrine that in such cases the witness may state his understanding of the language used is recognized in 2 Greenl. Ev. s. 417 ; *Leonard* v. *Allen*, 11 Cush. 241 ; *Stacy* v. *Port. Pub. Co.*, 68 Me. 279 ; *Smith* v. *Miles*, 15 Vt. 245 ; Odgers Libel & Slander, 539, and numerous cases there cited. And the same authorities declare that this evidence may be received to determine the nature of the offence charged by the article.

In the succeeding issue of the *Journal* and after this suit was brought, the defendants published another article referring to the one in question, to the plaintiff by name and to the suit he had brought. This article was put in evidence against the defendants' objection.

" Any words written or spoken of the plaintiff before or after those sued on, or even after the commencement of the action, are admissible to show the *animus* of the defendant." Odgers, 271.

" The second paragraph was admissible to show what the intention of the defendant was in publishing the first." Bosanquet, J., in *Barwell* v. *Adkins*, 1 Man. & Gra. 807.

The testimony of Meekin as to a conversation had with defendant Smith a few days after the first publication, in which a hostile feeling towards the plaintiff was manifested, was admitted. One question involved is, what was in the defendant's mind when he published the article ? Although his acts and words on that occa-

sion are the best evidence on this point, still if he afterwards gives expression to an ill feeling, that is to be received for what it is worth as pointing to his motive at the time of publication.

Many of the exceptions taken on the trial were abandoned in this court. We find no error in the judgment below, and the same is affirmed.