ALBERT T. WESTON, Respondent, *v.* COMMERCIAL ADVERTISER ASSOCIATION, Appellant.

LIBEL — DEFAMATORY STATEMENTS AS TO CERTAIN CLASS OF PUBLIC OFFICIALS — ACTION BY ONE OF SUCH PERSONS TO RECOVER DAMAGES — DEMURRER. Where an article, published in a newspaper at the time of the criminal conviction of a coroner of the city of New York, detailed with great particularity the manner in which unlawful and iniquitous practices were employed in the office of coroner to secure illegal gains, more than once specifically mentioned the coroners' physicians as employ-

ing these means, stated that the criminal practices pervaded " the entire office," but that "most of the graft goes, not to the underlings, but to those higher up," it cannot be said as matter of law that such language was employed in criticism of some body or class or in relation to general conditions, and that it had no personal and individual application or significance; and a demurrer to the complaint in an action of libel, by a coroner's physician in office at the time of the publication of such article, alleging that it was published of and concerning the plaintiff as such physician, and demanding damages therefor upon the ground of failure to state a cause of action, is properly overruled.

*Weston* v. *Commercial Advertiser Assn.*, 110 App. Div. 888, affirmed.

(Argued March 2, 1906; decided April 17, 1906.)

Appeal, by permission, from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered January 30, 1906, which affirmed an interlocutory judgment of Special Term overruling a demurrer to the complaint.

The following question was certified : " Does the complaint state facts sufficient to constitute a cause of action ? "

The nature of the action and the facts, so far as material, are stated in the opinion.

*Howard Taylor* for appellant. When defamatory language is written or spoken of a certain set of men the same does not support an action for libel or slander by either one or all of the class. (*Sumner* v. *Buel*, 12 Johns. 475 ; *Ryckman* v. *Delavan*, 25 Wend. 186 ; *Ellis* v. *Kimball*, 16 Pick. 132 ; *Eastwood* v. *Holmes*, 1 Fost. & Fin. 347 ; Newell on Slander & Libel, 258.) The article in the case at bar, describing a course of conduct habitual throughout a public office or bureau, falls within the category of defamatory language addressed to a set or class of men, and, therefore, does not support an action. (*Bourne's Case*, Rolle's Abr. 81.)

*Henry W. Unger* and *Abraham Levy* for respondent. A direct imputation of wrongdoing against all persons of a particular body is a libel upon every one of the persons constituting the body. (*Ryckman* v. *Delavan*, 25 Wend. 186 ; *Gedney* v. *Blake*, 11 Johns. 54.)

Hiscock, J.   This action was brought to recover damages for an article alleged to be libelous and to have been published by the defendant of and concerning the plaintiff as a coroner's physician or deputy coroner of the city of New York.

The defendant by its demurrer urges the proposition that the article published by it was not addressed to the plaintiff or to any particular individual, but was addressed to a course of conduct claimed to prevail in a public office; that the alleged defamatory words were written of a certain set or class of men and that plaintiff as an individual cannot maintain this action simply because he belonged to that set. The demurrer and this argument based upon it have thus far been overruled, and, as we think so correctly, that the judgment appealed from should be affirmed.

At the time of the publication of the article there were four coroners in the borough of Manhattan and a qualified physician appointed by each coroner as a coroner's physician. Plaintiff was one of these physicians or, as they were sometimes designated, deputy coroners.

On or about February 2, 1905, one Jackson, then being a coroner for said borough, was convicted of the crime of attempt at bribery. Thereafter and upon February 20, 1905, the article in question was published which, stripped of all allegations by way of introduction and innuendo, read in part as follows:

"Says Graft Rules the Coroners. Former Bureau Official Declares 'System' Runs Perfectly; 'Hush Money' Abundant; $500 or even $1,000 Paid by Hotels to Keep Suspicious Cases out of Papers; Death Coined into Cash; Men enter Bureau with a 'Shoe String' and Leave with Comfortable Fortunes.

"'The Coroner's office,' said a former prominent official of that office, while discussing it to-day in connection with the recent conviction of Dr. Jackson, 'is a hot-bed of corruption in which the system runs more freely than in any other department, not excepting even the Police Department. The

31

'system' runs in the coroner's office with absolute impunity. It pervades the entire office, but I should say that the most of the graft goes, not to the underlings, but to those higher up.'" Then followed a purported statement in detail of the manner in which the corrupt system said to prevail in said office was carried on, including the following: "'Say a young girl dies suddenly from purely natural causes. The death is reported and the coroner's physician goes to the house. He looks at the body, examines it, questions the members of the family and becomes convinced that there is nothing suspicious in the death and that a permit for the burial may be issued. But where is he going to come in? Looking at the anxious father and mother he shakes his head and says with a note of pity in his voice, 'I'm afraid the body will have to be removed to the morgue. I'm sorry, but it is evidently a case for an autopsy.' Can't anything be done? 'Oh, Coroner!' or 'Oh! Doctor,' the parents exclaim, 'can't anything be done to save us this? It will break our hearts! And the shame of it! She died a natural death and there is no need of an autopsy. Is there no way of saving us?' 'It's too bad, really, but I must perform my duty no matter how disagreeable it is,' replies the coroner or his deputy, in a sympathetic way, and with still another note in his voice as he moves towards the door. Then there is a hurried conversation among the members of the family. The mother disappears, reappears and sidles up to her husband and he in a moment is beside the departing official who has not yet reached the door. 'I'm very sorry, doctor, that nothing can be done,' and without a moment's delay comes the response, 'Oh, that will be all right,' and the official is gone. The poor family have given up a badly needed $5 bill, but they have saved a loved one's body from the morgue; the official quietly chuckles to himself as he makes his way to the street $5 is $5.'"

Then followed still further statements of the manner in which this same system upon a larger scale of payments was employed in extracting money from proprietors of hotels where deaths had occurred liable to attract suspicion or occa-

sion notoriety and in which specific reference was made to the coroner and his physician as guilty of these iniquitous practices.

Then still further we find : " ' In the coroner's court,' added the former official, ' the same ' long green ' has a far reaching effect. This is the evidence of the coroner's physician which may be affected by it and the charge of the coroner to the jury. In fact, there are a hundred and one ways in which money will tell.' ' But what are you going to do about it ? ' asked the former official. ' Abolish the coroner's office ? Not a bit of good. It would only turn the graft into the pocket of some other person or persons. Official corruption is widespread and every man seems to be out for the ' almighty dollar.' ' "

Proper allegations are employed in the complaint alleging the identity of plaintiff and the relation to him of the various statements in the article.

So far as we are aware there is no particular controversy about the general principles of law which are applicable to such an alleged libelous article and which distinguish between one relating to a body or a class and one pointing at an individual. The distinction between an article censuring or satirizing an entire class or body of individuals and one which aims defamatory statements at an individual is well settled. The former may not be made the basis of an action for individual damages, and the latter may. As it was expressed in *Ryckman* v. *Delavan* (25 Wend. 186), in terms which advantageously may be quoted now : " General censure or reproof, satire or invective, whether on moral, theological, or political grounds, cannot ordinarily be prompted by individual malice or intended to produce personal injury. * * * The principle upon which the civil remedy is allowed does not apply here, and the great interests of society require that it should not be made to apply. It is far better for the public welfare that some occasional consequential injury to an individual, arising from general censure of his profession, his party or his sect, should go without remedy, than that free discussion on the great questions of politics, or morals or faith, should

be checked by the dread of embittered and boundless litigation. * * * Yet it does not thence follow, because a man is libeled — not by name or title or other specific description of himself, but under some such description of persons as includes certain other persons, and marks the individuality of each of them as much as if they were all severally named — that, therefore, this is no libel, having a personal application upon which a civil suit can be maintained. The application of the injurious charge to a particular person must be made on the same principle that the meaning of the charge itself is explained. Both are to be taken according to the common understanding of men and the customary use of language. * * * If it appears clearly and undeniably on the plaintiff's own declaratory statement of his case, that the charge was made against a whole body of men, such as lawyers, clergy or brewers, etc., this is not a libel upon any individual of that class, and the courts must so pronounce it. But if the words may by any reasonable application import a charge against several individuals, under some general description or general name, the plaintiff has the right to go on to trial, and it is for the jury to decide whether the charge has the personal application averred by the plaintiff."

When we test the article in question by the principles thus enunciated, we believe that a jury fairly might be permitted to say that it sufficiently identified and pointed at the plaintiff to be libelous of him, although it did not in terms name him. The article must be assumed to have related to conditions as they existed at the time of its publication. Plaintiff then was one of four coroners' physicians in the borough of Manhattan. The article was written at a time when the criminal conviction of a coroner was apt to attract close and unfavorable attention to the office and its occupants. It detailed with great particularity the manner in which unlawful and iniquitous practices were employed to secure illegal gains, and more than once specifically mentioned the coroner's physician as employing these means. In addition, it stated that these criminal practices pervaded " the entire office," but that " most

of the graft goes, not to the underlings, but to those higher up." We do not think we could well say as a matter of law that this language was employed in criticism of some body or class or in relation to general conditions and that it had no personal and individual application or significance. It seems to us, upon the other hand, that a jury would be justified in saying that this language, which described these corrupt practices with specific designation by their titles of the officers who employed them, and which stated that they pervaded "the entire office," applied to every individual then in that office, and accused every one of them, including the plaintiff, as a coroner's physician, of being implicated in them. Very likely an article which stated in general terms that all the coroners in the state were a bad and corrupt lot would not be libelous as against some individual who happened to be a member of the office somewhere. Upon the other hand, if an article stated in so many words that every one of the four coroners and of the coroners' physicians at a given time occupying office in the city of New York was corrupt and took bribes, we apprehend that there would be no serious controversy over the proposition that any one of those individuals might maintain an action. The question here is whether the article complained of is analogous to the first or to the last article assumed. It seems to us more nearly akin to the last one, and certainly it would be within the province of the jury to give such meaning, construction and application to the language used as would bring it within the principles permitting this action to be maintained.

. The case of *Bornmann* v. *Star Co.* (174 N. Y. 212) has been referred to by the respondent as especially decisive of the merits of this demurrer. We agree, however, with the learned counsel for the appellant that the discussion in that case did not proceed especially upon the question here involved. The divergence in opinion between different members of the court arose over other points. Still, the prevailing opinion was based upon assumptions which, so far as applicable, do. tend to sustain the sufficiency of plaintiff's complaint.

The judgment of the Appellate Division, affirming the interlocutory judgment of the Special Term, must be affirmed, with costs, and upon payment of such costs the defendant shall have leave to answer within twenty days.

CULLEN, Ch. J., O'BRIEN, HAIGHT, VANN, WERNER and WILLARD BARTLETT, JJ., concur.

Judgment affirmed.