### SERVICE PARKING CORPORATION v. WASHINGTON TIMES CO.

No. 6867.

United States Court of Appeals for the District of Columbia.

Decided July 19, 1937.

Edwin Swingle, Mark P. Friedlander, and Robert I. Silverman, all of Washington, D. C., for appellant.

R. H. Yeatman, of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, GRONER, and STEPHENS, Associate Justices.

STEPHENS, Associate Justice.

This is an appeal from a judgment of the District Court of the United States.

for the District of Columbia entered upon a verdict directed for the appellee, defendant below, at the close of the case for the appellant, plaintiff below. The appeal presents two questions, one, whether or not certain excluded testimony should have been received, the other, whether the motion for a directed verdict should have been denied.

The action was in tort for libel. The appellant complained of the following newspaper article:

"Parking Lot Racket Probe Ordered Here.

"Major Brown Says Chiselers Renting Space Move Cars to Streets; Even Pay Fines.

"A drive by police and the District Attorney's office to halt the chiseling of parking lot owners and garages, which are depriving the public of much of its parking space on the public streets, will be launched today, Major Ernest Brown, Superintendent of Police, announced.

"A statement by the American Automobile Association yesterday revealed its observers have discovered parking lot owners consistently placing cars on the streets from the lots, thus allowing more space on the lots, and less on the streets.

"Pay Car Fines.

"The situation was confirmed by Major Brown, who said he has received many complaints as to this practice. Between 15 and 20 cars, originally placed on parking lots but later shifted to the streets, have been tagged for overparking, he said. In each case the parking lot proprietor has paid the fine.

"He will confer today with the District Attorney's office, to see whether the lot owners can be charged with 'conducting an illegal business' or 'obtaining money under false pretenses.'

"A squad of 20 plain clothes policemen will patrol the downtown section today. Whenever they see a parking lot placing a car on the streets, they'll tag that car.

"The police superintendent hoped that some automobile owner who finds his car parked on the streets, after placing it on a lot, will call police and place charges of 'obtaining money under false pretenses' against the parking lot owner." [1]

The appellee admitted publication of the article.

At the trial the appellant proved that: Taking the downtown section of Washington to mean that part of the city between Pennsylvania Avenue and K Street and between Seventh and Fifteenth Streets, N. W., there were, at the time of publication of the article complained of, from twenty to thirty parking lots therein operated by ten or twelve owners, the appellant being the owner and operator of nine of the lots. The appellant then called a witness who testified that on the date of the article complained of, he was acquainted with the manager of the appellant's parking lots, that he had from time to time used them, that he had seen the article and was familiar with its contents. He was then asked whether or not he had formed an opinion, from reading the article, to whom it applied, and upon answering in the affirmative was asked to whom he understood it to apply. This question was objected to by the appellee and the objection sustained and an exception duly noted in the appellant's favor. The appellant then offered to prove by the witness that the witness understood that the article referred to the appellant and meant that the appellant was guilty of the acts described therein. It was stipulated by the parties that the terms "racket" and "chiseler" used in the article meant, respectively, the business of illegally extorting money from another, and one whose actions are contrary and unfair to the public interest. The appellant then rested and the appellee moved for a directed verdict. The ground of the motion was that "there had been no showing that the article complained of had applied to the plaintiff, nor any circumstances shown which would reasonably permit the jury to find that the article could be understood to mean the plaintiff." The motion was granted, and the appellant was allowed an exception. Under instructions from the court, a verdict was returned for the appellee. Upon this verdict a judgment was entered in the appellee's favor. From that judgment this appeal was taken.

■ In respect of the question of evidence: The ruling of the trial court excluding the proffered evidence was cor-

[1] As printed in the appellant's complaint, the article was accompanied by appropriate words of innuendo applying the article to the appellant and the appellant's lots.

rect. To the general rule that opinion evidence is not admissible, an exception is recognized in libel cases in some jurisdictions. It is held that if the defamatory statement does not name the plaintiff but does use terms or mention circumstances of an identifying nature, a witness who knows the parties and the identifying effect of the terms and circumstances, may state his opinion as to the application thereof to the plaintiff. Thus in Miller v. Butler, 6 Cush.(Mass.) 71, 52 Am.Dec. 768, the reference in a defamatory letter was to "the doctor." Witnesses were permitted to testify that the plaintiff was a doctor, and one witness was permitted to testify that he thought the words "the doctor" referred to the plaintiff. Again in Knapp v. Fuller, 55 Vt. 311, 45 Am.Rep. 618, the defamatory article described the subject thereof as "one of our prominent officials," and contained the inquiry "was said official there on *probate* business?"—the charge being that "one of our prominent officials" was at a given place under improper circumstances. Witnesses were permitted to explain that the terms quoted identified the plaintiff, the latter being a probate officer. In Smawley v. Stark, 9 Ind. 386, it was charged that the defendant, in accusing an unnamed person of stealing his money, had stated that the man who stole his money was a great many miles away, was well acquainted with his house, had been accommodated by him with loans of money, and was a near neighbor. It appeared in the case that at the time the defamatory statement was made the plaintiff was in another state, that he was well acquainted with the defendant's house, had borrowed money from the defendant, and was a near neighbor. Witnesses familiar with these circumstances and with the parties were permitted to testify that in their opinion the defendant in his statement referred to the plaintiff. See, also, Smart v. Blanchard, 42 N.H. 137.

■ The testimony proffered in the instant case is not within the exception recognized in the cited cases. The apparent basis of the exception is that where defamatory material fails to identify the plaintiff by name, a witness who has personal acquaintanceship with the parties and knowledge of the meaning of identifying terms used and circumstances referred to, is in a proper sense an expert whose opinion as to the identifying effect of the terms and circumstances may be brought to the aid of the jury. Such a witness may make an inference which the jury itself, for lack of special knowledge, could not make. The witness whose testimony was proffered in the instant case was not shown to possess any special knowledge of identifying terms or circumstances which put him in any better position than the jury to draw inferences as to the application of the article to the appellant.

■ In respect of the ruling of the court on the motion for a directed verdict: That ruling also was correct. It was necessary for the appellant to prove that the defamatory words referred to him. As it is put in Odgers, Libel and Slander (6th Ed.1929) p. 123:

"The defamatory words must refer to some ascertained or ascertainable person, and that person must be the plaintiff.

"If the words used really contain no reflection on any particular individual, no averment or innuendo can make them defamatory. 'An innuendo cannot make the person certain which was incertain before.' (4 Rep. 17b.)

"So if the words reflect impartially on either A. or B., or on some one of a certain number or class, and there is nothing to show which one was meant, no one can sue. . . ."

On the other hand, as stated by the same author, pp. 124, 125:

"Where the words reflect on each and every member of a certain number or class, each or all can sue.

\* \* \*

"Though the words used may at first sight appear only to apply to a class or number of persons, and not to be specially defamatory of any individual, still an action may be maintained by any particular member of that class or number who can satisfy the jury that the words referred solely or especially to himself. The words must be capable of bearing such special application, or the judge should stop the case. . . ."

Newell, Slander and Libel (4th Ed.1924) § 220, pp. 262–263, expresses it thus:

"Where defamatory matter is published against a class or aggregate body of persons, an individual member not specially included or designated cannot maintain an action, for this, among other reasons that the body may act very corruptly or disgracefully, and yet the individual

may have been in the minority and may have opposed measures alluded to; but where many individuals are severally included in the same attack, whether by the language of the satirist or the pencil of the caricaturist, the plaintiff is none the less entitled to redress because others are injured by the same act. But the words must be capable of bearing such special application to the plaintiff. . . ."

Thus in Comes v. Cruce, 85 Ark. 79, 107 S.W. 185, 14 Ann.Cas. 327, the defamatory article in giving an account of a murder attributed the same to fraudulent and illegal practices of persons in the community engaged in growing grapes and making wine. It charged that they sold adulterated wine and hard liquor at "wine joints." The plaintiff asserted that he was engaged in growing grapes and making wine in the community in question. There were a large number of such persons. The Supreme Court of Arkansas, affirming a trial court's ruling that a complaint embodying such facts was demurrable because the article pleaded insufficiently identified the plaintiff, said:

"There is no language in the writing which individualizes the appellant unless it be the following: 'The first trouble which led up to the killing occurred in one of these joints, so we understand.' But this language alone contains nothing libelous, and, when connected with other parts of the article, it does not appear that any individual was referred to as having violated the law, or that the business of any individual as distinct from a class, was specified as being illegal and obnoxious to the penalties denounced by the law against those who sell adulterated wine. The publication, as a whole, affects only a class, and no malice or ill-will of any kind could be legitimately construed to be indulged toward any individual of that class and directed towards him. There being nothing in the article that by proper inducement and colloquium·can be given personal application to appellant, the court was correct in holding that no cause of action was stated." [85 Ark. 79, at page 83, 107 S.W. 185, at page 186]

Again, in Louisville Times v. Stivers, 252 Ky. 843, 68 S.W.(2d) 411, 97 A.L.R. 277, the article complained of was disparaging to "the Stivers clan," as a member of which the plaintiff sued. The Kentucky Court of Appeals, reversing a judgment for the plaintiff said, quoting from 17 R. C.L. § 127, p. 375:

"'It seems that where the class or group in question is a very large one and there is little or nothing said or written which applies to the particular person who brings his action, the right of recovery will be denied.'" [252 Ky. 843, at page 847, 68 S.W.(2d) 411, at page 412, 97 A.L.R. at pages 279, 280]

See, also, to similar effect: Eastwood v. Holmes, 1 F. & F. 347, 175 English Reports (Full Reprint) 758.

On the other hand, in Weston v. Commercial Advertiser Ass'n, 184 N.Y. 479, 77 N.E. 660, the article complained of charged that the New York City coroner's office was graft ridden, and described methods allegedly used by the coroners and their physicians to extort funds from the public. There were four coroners and each had a physician assistant. Holding that one of the four physicians could maintain an action, the Court of Appeals of New York said:

"Very likely an article which stated in general terms that all the coroners in the state were a bad and corrupt lot would not be libelous as against some individual who happened to be a member of the office somewhere. Upon the other hand, if an article stated in so many words that every one of the four coroners and of the coroners' physicians at a given time occupying office in the city of New York was corrupt and took bribes, we apprehend that there would be no serious controversy over the proposition that any one of those individuals might maintain an action. The question here is whether the article complained of is analogous to the first or to the last article assumed. It seems to us more nearly akin to the last one, and certainly it would be within the province of the jury to give such meaning, construction, and application to the language used as would bring it within the principles permitting this action to be maintained." [184 N.Y. at 479, 485, 77 N.E. at 660, 662]

The rule thus stated by the courts and text writers represents, undoubtedly, what has been regarded as a sound compromise between the conflicting interests involved in libel cases. On the one hand is the social interest in free press discussion of matters of general concern, and on the other is the individual interest in reputation. The courts have chosen

not to limit freedom of public discussion except to prevent harm occasioned by defamatory statements reasonably susceptible of special application to a given individual.

Applying the foregoing to the instant case: Omitting from the article complained of the statement that "A squad of 20 plain clothes policemen will patrol the downtown section today," the appellant's case clearly failed, under the rules stated, to prove that the article referred to him. And the quoted statement, together with the appellant's evidence as to the number of lots owned and operated in the downtown section and the number owned and operated by him, does not add enough to the appellant's case to satisfy the rules. The jury could not reasonably have concluded from the appellant's evidence that the article referred "solely or especially" to him. Putting it otherwise, we think that the jury must reasonably have concluded that the article was "published against a class or aggregate body of persons . . ." Giving the appellant the benefit of all legitimate favorable inferences, the article could not reasonably be said to concern more than downtown parking lots and their owners as a class. There is no language referring "to some ascertained or ascertainable person." Nor is the downtown class so small, as shown by the appellant's evidence, as to cause defamation of it to defame the appellant. Under the rule settled in the Federal courts, the appellant was bound to produce not merely a scintilla of evidence, but substantial evidence, that the article referred to him. Fleming v. Fisk, 66 App.D.C. 350, 87 F.(2d) 747; Schwartzman v. Lloyd, 65 App.D.C. 216, 82 F.(2d) 822; Hopkins v. Baltimore & Ohio Railroad Company, 65 App.D.C. 167, 81 F. (2d) 894. We think he did not do so.

We have considered the numerous authorities cited in the appellant's brief, but we think it not useful to discuss them in detail. No cases are cited from this jurisdiction. The question whether on any particular issue there is evidence for a jury is one which must be decided according to the best judgment of the reviewing tribunal on the particular record involved, that is to say, each case must rest largely on its own facts, since there are usually such variations in the facts

of others as to make them not persuasive.

The trial judge properly stopped the case. The judgment is

Affirmed.