**UNITED MEDICAL LABORATORIES, INC., an Oregon corporation, Plaintiff,**

v.

**COLUMBIA BROADCASTING SYSTEM, INC., a New York corporation, Walter Cronkite, Jay McMullen, Morris Schaeffer, and Victor Buhler, Defendants.**

**Civ. No. 65–318.**

United States District Court
D. Oregon.
Sept. 8, 1966.
Rehearing Denied Oct. 4, 1966.

Roland F. Banks, Jr., Mautz, Souther, Spaulding, Kinsey & Williamson, Portland, Or., for plaintiff.

Manley B. Strayer, Cleveland C. Corey, Davies, Biggs, Strayer, Stoel & Boley, Portland, Or., for defendants.

## OPINION

KILKENNY, District Judge:

Plaintiff charges the defendants with maliciously publishing false and defamatory statements related to plaintiff by means of radio, television and the press. Substantial special, compensatory and punitive damages are claimed. Previously, the Court quashed the service of process on defendants Morris Schaeffer and Victor Buhler. United Medical Laboratories, Inc. v. Columbia Broadcasting System, Inc., et al., 256 F.Supp. 570 (D.Or.1966).

The cause is before the Court on the motion of the remaining defendants to dismiss.

All of the broadcast material is before the Court and in the course of the hearing on the motion to dismiss, the Court actually viewed the telecasts. The parties have indicated that all relevant and material matters with reference to plaintiff's claim are now before the Court.

Plaintiff is an Oregon corporation operating a clinical testing laboratory. It tests and analyzes biological specimens and samples, which it receives by mail from physicians and pharmaceutical companies throughout the United States. Defendant McMullen is head of the Fact Finding Unit of defendant Columbia Broadcasting System, Inc. (CBS). Shaeffer is head of the Bureau of Laboratories of the New York City Department of Health. Cronkite is the featured news commentator on "CBS Evening News," a nightly television broadcast. Buhler is President of the College of American Pathologists.

Defendants participated in the telecasts "CBS Evening News with Walter Cronkite" on the evenings of June 22nd, 23rd and 24th, 1965, and in the broadcasts of "The World Tonight" on June 22nd and 23rd. Defendants also caused the publication of a news release on June 23rd, describing the disclosures made on the telecast of the night before.

Before the programs and news release were published on June 23rd, plaintiff demanded, by telephone, that CBS retract the alleged implications of statements during the June 22nd programs. CBS took no such action. Later on June 23rd, CBS contacted plaintiff through its affiliate, KOIN-TV, requesting pictures of plaintiff's operations and an interview with its employees, with a view toward publishing these as a part of the June 24th edition of "CBS Evening News." Pictures were taken by KOIN-TV personnel, and an interview with one of plaintiff's employees was recorded. These materials were sent to CBS on June 24th, but did not appear on the June 24th programs, and have not appeared since.

Plaintiff claims that the broadcasts of June 22nd and June 23rd were seen and heard by persons within and without Oregon. These persons, and the persons and organizations who received the news release, are said to have understood the matter therein to refer to plaintiff. Plaintiff claims that its business damage as a result of these publications totals $500,000.00, that it has lost $100,000.00 worth of physicians' accounts, and that

*it* is entitled *to* exemplary damages in the sum of $500,000.00.

The broadcasts publicized the results of a five-month investigation by Jay Mc-Mullen and the CBS News Fact Finding Unit. Under the name of a "cooperating physician" in New York City, letters were sent to 43 mail-order laboratories outside New York State, in 33 cities in 14 states (not including Oregon, as a map displayed on one of the broadcasts showed.) Thirteen of these did not reply; thirteen others, according to McMullen, "said that most of the tests required could not be handled accurately through the mails * * * and suggested that these tests be done locally in New York City." Seventeen, or 39%, sent the equipment and mailing containers requested in the letters, indicating their willingness to conduct one or more of the six routine laboratory experiments described. Specimens were prepared and packaged in the containers and immediately airmailed back. Samples of each specimen were also sent to four control laboratories in New York City. Comparison of the findings formed the basis of the "Special Report." The results, in substance, were as follows:

1. Bacterial specimen—Salmonella, Group D: 100% of the mail-order laboratories tested failed to identify it as a Salmonella of any kind. Group D Salmonella includes an organism capable of causing typhoid fever.

2. Prothrombin Time Test—how quickly does blood clot?: the control laboratories found that the blood specimen submitted was in a normal range. The mail-order laboratories which reported said that the clotting time was between 50 and 53% below normal.

3. Acid Phosphatase Test—control laboratories said the specimen was normal: of the mail-order laboratories tested, 25% said it was abnormal.

4. Blood Sugar—found by control laboratories to be abnormally high in blood sugar, an indication of diabetes; 4 mail-order laboratories said it was normal; the reports of 71% of the mail-order laboratories replying varied from the control laboratories' reports by from 20% to 104%.

5. Complete blood count and urinalysis—the medical experts agreed that the reports of the mail-order laboratories showed "a disturbing variation" from the reports of the hospital control laboratories.

Of five New York City laboratories subsequently tested, and one of the control laboratories, all failed the "Salmonella Group D" test.

These disclosures were made on the Cronkite broadcast of June 22nd and repeated on "The World Tonight" later that evening. The next evening, both programs were devoted to a single laboratory that had failed the same test, a "hormone assay" on urine, 12 times, and to the unethical practices in which CBS research indicated the laboratory's owners were involved. The third telecast discussed the implications of the findings. The news release of June 23rd summarized the first telecast.

Plaintiff contends that slogans flashed across the television images during the first telecast, stating the percentage of error among the mail-order laboratories tested, did not limit the reference to only those laboratories which participated in the survey, e. g., "Mail Order Laboratories 100% Wrong." The dialogue set forth in the Addenum is representative of the materials and includes all references that conceivably could be construed as relating inferentially to United Medical Laboratories.

## CONTENTIONS

■ I. *Were the "references" published clearly limited to parties explicitly identified, or identified as participants in the CBS tests?*

On the telecast of June 22nd, Cronkite noted the widespread reliance by doctors on mail-order tests. Giving short shrift to the view that such reliance is often necessary because of the deficiencies of local laboratories, he said that "for *some* small town doctors the inducement *may* be *partly convenience.*" (Emphasis supplied.) This, coupled with the dra-

matic statement that "anyone" can engage in such a business without fear of federal interference, the two statements being sandwiched around a charge that some mail-order laboratories advertise "cut rate service," conveys the impression that the practice may often be neither necessary nor greatly advantageous in the treatment of patients.

Dr. Buhler is then heard to say that results are often inaccurate due to the deterioration of specimens in the mails; McMullen, however, immediatey refers to this as a "doubt," shared by many experts, as to the possibility of accurate testing of certain specimens through the mails.

All of this is immediately clarified as speculation, insofar as it may suggest inferences relating to mail-order laboratories generally, by McMullen's explanation of the CBS investigation. Of 43 laboratories contacted outside New York, 13 replied, saying that the specimens mailed could not be tested accurately by mail. Only 17 labs, less than half of those contacted (excluding the five New York laboratories), attempted to perform the tests.

Despite whatever might have been suggested by the slogans flashed across the screen, the dialogue clearly emphasized the fact that the results being reported related *only* to the laboratories actually tested. The concluding comments of Cronkite and McMullen referring to the "labs in question" and the "labs tested," may hint at problems inherent in mail-order work, but include the following clear qualification by McMullen: "How typical are these results? *We don't know*, but a sick patient may get only one chance to find out."

Similarly, McMullen's explanation of the investigation, and his concluding remarks, clarified any possible broad connotations of Calmer's remarks on the radio broadcast of June 22nd. Calmer spoke briefly of "mail-order medicine," then of how far "your doctor" might ship a sample of "your blood," but his remarks were immediately followed by the inter-

view and comment aired earlier on the Cronkite show.

The news release of June 23rd is nothing more than a recitation of the test results, clearly indicating, in context, that the figures quoted related only to the laboratories tested, and were not projected estimates of the probable performance of mail-order laboratories generally. It merely repeats the fact that various authorities "doubted" the ability of such laboratories to perform certain kinds of tests, due to the deterioration of the specimens in the mails.

The telecast of June 23rd includes a summary by Cronkite of the test-results broadcast the night before, showing "widespread error among the mail order labs *checked* by the CBS News Fact Finding Unit." (Emphasis supplied.) The rest of the program was devoted to the Science Laboratories incident. Calmer's introduction to the same incident also clearly restated the findings of the tests, and included a reference to the "doubts" of medical authorities about mail-order testing of certain specimens. His program ended with a statement by Dr. Luther Terry that Terry's office was investigating "the matter," and with Calmer's report that Senator Javits had proposed legislation requiring mail-order laboratories generally to be inspected and licensed. Throughout these programs, the only trace to be found of a reference to mail-order laboratories generally is Cronkite's conclusion: "And how do the mail order labs themselves react to the findings * * *? A laboratory spokesman replies on this program tomorrow night."

The telecast of June 24th, including interviews with government officials who were investigating the same general subject of mail-order testing, contained an explicit statement by Cronkite that CBS had not "necessarily" intended to indict mail-order laboratories generally. There was then presented an interview with a research-laboratory medical consultant who insisted that the specimens used *were* amenable to testing by mail, provided

that proper precautions were taken by the laboratories and doctors.

From a survey of the allegedly defamatory materials taken together, or of any one of them taken singly, I conclude that the programs and news release were clearly limited in reference to the participants in the CBS tests. No inference could reasonably be made, from what was said, that mail-order laboratories generally would perform as poorly as those which were tested, or that any particular laboratory would perform poorly at all.

It is certainly true that the programs are reasonably calculated to attract attention to the business generally, and to create concern, if not suspicion, from which no mail-order medical laboratory would be altogether immune. However, no "charges" were made or insinuated. I believe from the transcripts that the programs were carefully planned to avoid that error. By repeated reference to the "labs tested," etc., and to the "doubts" rather than the "conclusions" or "opinions" of medical authorities about mail-order testing of certain specimens, the error was avoided. The whole point of such a "Special Report," however, is to create interest and, thus, inspire inquiry to determine if there are problems with which the public, and public officials, should be concerned. That much is evident from the repeated references to the absence of federal effective state supervision of mail-order testing. The materials here in issue are perhaps best described as "calling into question" the practices of mail-order laboratories generally, and the reliability of mail-order testing itself.

█ It has long been settled that on matters of public concern, reporting and questioning the conduct of private individuals and public officials is a proper function of public communications media. Thornhill v. State of Alabama, 310 U.S. 88, 101–2, 60 S.Ct. 736, 84 L.Ed. 1093 (1940).

█ Furthermore, it is well established that radio and television media share these rights for the same reasons. American Broadcasting Co. v. United States, 110 F.Supp. 374, 389 (S.D.N.Y. 1953), aff'd sub nom, FCC v. American Broadcasting Co., 347 U.S. 284, 74 S.Ct. 593, 98 L.Ed. 699 (1954). By virtue of the requirements of 47 U.S.C. § 315(a)(4), all FCC licenses are subject to a statutory requirement that they "afford reasonable opportunity for the discussion of conflicting views on issues of public importance." This applies not only to editorial comment, but also to programing. There may even be a social and moral duty to inform the public, with good motives, and proper purposes, of medical problems in a community. Blanchard v. Claremont Eagle (1941), 95 N.H. 375, 63 A.2d 791, 794 (1941) and, there is no doubt that medical quackery is a matter of great public concern. Brinkley v. Fishbein, 110 F.2d 62, 64 (5th Cir. 1940). That the performance of the laboratories here under scrutiny, relating, as it does, to public health, is a matter of public interest, cannot be questioned. Any discussion of the conduct of some persons or institutions in any business or profession, will naturally lead to questions with reference to the members of businesses or professions similarly situated. True enough, the statements, at times, went somewhat beyond bare reporting, but certainly that fact is not controlling. Even a statement of the bare findings, would, in my opinion, raise the same questions in the public's mind. Conceding that there are a number of statements, when taken out of context, which could conceivably refer to mail-order laboratories other than those tested, the overwhelming majority of those statements, when read in context, either clearly restrict the scope of the presentation or explicitly attribute the test results to the errors of individually named laboratories. I am persuaded that any actionable references were here clearly limited to the parties explicitly identified and to the laboratories participating in the surveys. Plaintiff does not fall in either one of those categories. The complaint does not state a claim.

II. Although my views just expressed dispose of the case, I recognize the probability of an appeal and that the appellate court might be interested in my impressions on other theories, so ably briefed by counsel.

It is inevitable, as previously stated, that public discussion of the conduct of persons and institutions will suggest public interest in persons and institutions similarly situated. If such "suggestion" is actionable, and we must inquire into the composition of the "class," the following observations are pertinent.

First, it was made clear that not all of the laboratories participated in all of the tests. Excepting only the five New York laboratories which performed only the "Salmonella" test, the findings reveal that not all of the laboratories were wrong on all of the tests they did perform. While all laboratories did fail the "Salmonella" test, 13 of the 48 laboratories contacted frankly admitted that they could not perform the requested tests, and another 13 made no reply at all to the CBS solicitations. Thus, at least 27.1% of the laboratories surveyed, and conceivably as many as 54.2%, were conscientious enough not to try to perform the analyses requested. At most, then, the suggestion is that some, but not all similarly situated laboratories might also try and fail to perform some, but not all of these analyses.

Secondly, the commentative materials, taken together or singly, simply do not justify the inference that the CBS findings call into question more than an unspecified portion of the "class" of "mail-order laboratories." Aside from the apparent care taken by defendants to avoid generalizations, as shown by the phrasing of the excerpts, the first and third telecasts, and the first radio broadcast, included explicit statements by Cronkite and McMullen that the laboratories tested did not necessarily typify the industry generally. The third telecast included the vigorous assertions of Dr. Winkelman to the same effect. Dr. Winkelman, concededly, did "fear" that

mail-order laboratories had gotten a "bad reputation" because of Cronkite's programs.

Thirdly, as to the suitability of certain specimens for mail-order testing, it is not fair to treat either the findings or the commentary as "class" references. The emphasis is, to repeat it again, on the "doubts" of the experts. Most of the findings are recited in terms of the laboratories "tested" or "replying," and in all but one of the tests it is evident that not all of the laboratories were in error. It is apparent that all 17 of the first-contacted laboratories took, and failed, the "Salmonella" test; at least, the materials do not say otherwise. Counting the New York laboratories later tested, all laboratories participating failed the test. Dr. Buhler's commentary, however, says that there are "specimens" which "deteriorate due to time and temperature," then offers this perfectly innocuous observation:

"Any laboratory that would accept a specimen on which accurate results cannot be obtained may be endangering the health and even the life of a patient."

He does *not* say, or imply, that any of the specimens used in the tests are *never* susceptible of accurate mail-order analysis. Thus, if the discussion of the specimens here tested *is* deemed to go beyond the laboratories participating in the CBS survey, it still would not refer to all those who accept these specimens. It would imply, at most, that these specimens present problems for mail-order testing, and that "Salmonella Group D" presents a bigger problem than most.

I hold that the materials here made no reference to an ascertainable "class" of laboratories. In American Civil Liberties Union v. Kiely, 40 F.2d 451 (2d Cir. 1930), a statute forbade the mailing of defamatory matter. The Postmaster refused to transmit certain envelopes on which appeared slogans condemning the unjust conviction of one Tom Mooney, and impugning "California

justice" Judge Augustus Hand recognized "an old rule of the common law":

" * * * where words complained of reflect on a class of persons generally without making it evident that *every* person of the class is referred to, no member can maintain an action. * * * When, however, the words reflect on each member of a class, each one may have an action, because the charge is made broadly against all.

* * * * * *

*(T)he words * * * must charge some identifiable person with something. Here the inscription contains general charges against a state, a system, or an indefinite class."* (40 F.2d at 453.) (Emphasis applied.)

The principle just stated is acknowledged in Marr v. Putnam, 196 Or. 1, 17–22, 246 P.2d 509 (1952), citing, *inter alia*, Ryckman v. Delavan, 25 Wend. 186 (N.Y. 1840); and Le Fanu v. Malcomson, 1 HLC 637, 9 Eng.Rep. 910, both also cited by Judge Hand. "An impersonal reproach of an indeterminate class is not actionable," according to Gross v. Cantor, et al., 270 N.Y. 93, 200 N.E. 592, 593 (1936). The same precept is stated in Service Parking Corp. v. Washington Times Co., 67 App.D.C. 351, 92 F.2d 502, 504–506 (1937), where the reference was to fraudulent practices by "parking lot owners" in the "downtown section" of a city and in Blaser v. Krattiger, 99 Or. 392, 195 P. 359 (1921), where the reference was to a "son of a bitch" who was "in this room," a room full of people. The plaintiff had no action; "people in this room" was not the class, as the reference was singular; the court doubted that plaintiff could establish membership in the class of those with female canine ancestry.

While the size of the class is not of paramount importance, there is a general rule that no action will lie unless some circumstance makes the statements reasonably susceptible of special application to the plaintiff. Watts-Wagner Co., Inc. v. General Motors Corp., 64 F.Supp. 506, 508 (S.D.N.Y.1945); Riss & Co. v. Ass'n of American Railroads, 187 F. Supp. 323, 326 (D.D.C.1960); Fowler, et al. v. Curtis Publishing Co., et al., 86 U.S.App.D.C. 349, 182 F.2d 377 (1950); Golden North Airways, Inc. v. Tanana Publishing Co., 218 F.2d 612, 618–620, 15 Alaska 303 (9th Cir. 1954).

Having already said that the materials here did not refer to an ascertainable class, I feel the above cases should govern. Plaintiff might still have an action, if it could show special reference to itself; that is, *other* than as a member of a class. Its evidence in that connection, however, is very scanty, which explains why its briefs are geared to the class-reference theory. It makes the point that C. Howard Lane, of the local CBS affiliates, said that CBS would normally send a news release like the one in question to KOIN and KOIN–TV, and to the Portland newpapers, "where the program dealt specifically with something in our area * * *." Thus, the papers might infer that the programs had been aimed at United Medical Laboratories. The theory is tenuous on its face, as the inference would still not seem to be reasonable. Further weakening the theory is the fact that the release was sent by teletype from New York City and Los Angeles, and by mimeographed copy from New York City, to cities throughout the country.

Plaintiff's cases such as Marr v. Putnam, supra, are clearly distinguishable. There, the plaintiff was the only person who would fit in the "racket" of advertising radio repair service. In other cases such as Lathrop v. Sundberg, 55 Wash. 144, 104 P. 176, 25 L.R.A.,N.S., 381 (1909); Chapa v. Abernethy, 175 S.W. 166 (Texas, Civil App. 1915); Palmerlee v. Nottage, et al., 119 Minn. 351, 138 N.W. 312, 42 L.R.A.,N.S., 870 (1912), the class was so small that immediate identification was possible of all members. It is my belief that Fawcett Publications, Inc. v. Morris, 377 P.2d 42 (Okl.1962), appeal dismissed and cert. denied 376 U.S. 513, 84 S.Ct. 964, 11 L.Ed.2d 968 (1964), rehearing denied 377 U.S. 925, 84 S.Ct. 1218, 12 L.Ed.2d 217 (1964), should be placed in the same classifica-

tion. There, the article in True Magazine suggested that the football players of the University of Oklahoma had, in full view of television cameras at a game, sniffed "pep-up" drugs. While the article did not state that all of the team members had "sniffed," it did leave the inference that at least the "regulars," the players who participated, "sniffed." Since there was a class to which the plaintiff was a member, there was a strong inference that he either participated in taking the "sniff," or countenanced the taking of the drug by others.

■ The critical inquiry into the actionability of a class reference is a reasonable certainty of reference to the plaintiff as a member. Here, two classes were involved: (1) "mail-order laboratories" and (2) "mail-order laboratories performing the particular tests." The class referred to in the materials under scrutiny would necessarily be one of the above. It is my conclusion that only class number two was covered by the published materials. Plaintiff urges that the programs made particular reference to "laboratories which operate interstate and actually service thousands of doctors."

As a matter of law, no greater aspersions were cast upon them than upon other mail-order laboratories. Cronkite did introduce the first telecast by saying,

> "Across this nation an untold number of doctors with untold thousands of patients depend on medical analysis conducted by mail order laboratories."

In no way, however, did he suggest how many doctors relied on the larger laboratories, or how many dealt with interstate operators. Nowhere in the series, or in the news release, was there any hint that *most* of the laboratories tested "operate interstate *and* serviced thousands of doctors." Indeed, any viewer who knew—if it is a fact—that these numbered about 12, knew that the odds were against it, since 48 labs were contacted initially and 22 were finally tested. The materials did comment repeatedly on the absence of federal regulation

of "mail-order laboratories," but they also commented on the lack of effective state regulation, and on the variances among the states' provisions. The officials interviewed were federal officials; but federal jurisdiction could rest as well upon the laboratories' use of the mails as upon their shipments across state lines, and this was specifically noted during the interviews of the Chief Postal Inspector and the FDA Commissioner. Finally, though the New York laboratories tested were sent specimens from out of the state, the fact is not mentioned on the air. The news release mentions it only incidentally, to show that these laboratories, like the others, were tested with specimens sent from a distance, "outside the New York city area." In short, the materials make *no* reference whatever to the size of the laboratories tested or contacted, and *no* particular point about the interstate character of the analyses conducted. Any inferences they suggest, therefore, could not reasonably be understood to apply specially to interstate concerns, small or large.

Of course, it is then irrelevant that plaintiff is among the few concerns who did the most business. No one who took his business elsewhere because of the laboratory-exposé here, obviously, would take it to another mail-order laboratory, large or small.

## SPECIAL PRIVILEGE

■ Defendants also urge that a forthright discussion of subjects pertaining to "public health" should be granted the same partial immunity as that granted to a discussion of "public officials." Rosenblatt v. Baer, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966); New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); Garrison v. State of Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). While the doctrine of partial immunity, as taught in those cases, may eventually find its way into the field of public health, I can find no supporting authority for application at this time. Quite frankly, the suggestion is not judicially

unattractive. There is no reason why the communications media should keep the public less well informed about those engaged in the public health field, than about the merits and demerits of public officials. The mantle of partial immunity might well cover both.

Although I am well aware of the directives of the Court of Appeals to the trial courts in connection with the danger, under ordinary circumstances, of allowing a motion to dismiss, I find no alternative on the record before me. For that matter, the essential facts are undisputed. No claim is made by the plaintiff that the complaint could be amended so as to show additional facts beyond the present record. Since I would direct a verdict in defendants' favor on the present record, I find no reason why I should place the heavy burden of additional attorney fees and other expenses on the parties by forcing them to pre-trial and to trial.

On appeal, I would suggest that the appellate court be offered the privilege—which was mine—of seeing the telecasts. No doubt, the jurisdictional question raised by defendants will also find its way to the Court of Appeals.

## ADDENDUM

There follows here representative excerpts from the telecasts, broadcasts and news releases which gave rise to this case.

A. TELECAST OF JUNE 22.

CRONKITE: "* * * Across this nation an untold number of doctors with untold thousands of patients depend on medical analysis conducted by mail order laboratories. * * For some small town doctors the inducement may be partly convenience. But ʌome mail order laboratories advertise the economic benefits of their cut rate service. * * But the mail order laboratory business operates virtually without government control. As far as the Federal law is concerned, anyone, no matter what his qualifications, can open up a clinical laboratory and engage in interstate business. * * * "

BUHLER: "* * * While it is true that accurate results can be obtained on some specimens sent through the mail, there are many which deteriorate due to temperature and time and the results are inaccurate. Any laboratory that would accept a specimen on which accurate results cannot be obtained may be endangering the health and even the life of a patient."

McMULLEN: "Because numerous health authorities share the doubt that many types of human medical specimens cannot be tested accurately after they have been sent through the mails, we decided to set up an experiment to test mail order laboratories. * * * "

SHAEFFER: (Throughout the statement of the test results by McMullen on this first broadcast, Shaeffer interjected comments as to the gravity of the errors involved.)

McMULLEN: "* * * The final results of our experiment; 88 per cent of the 17 mail order laboratories tested were wrong on one or more of the tests they undertook. (He then reported that the 5 New York City laboratories tested, and one control lab, were all wrong on the 'Salmonella Group D' test.) * * * How typical are these results? We don't know, but a sick patient may get only one chance to find out."

CRONKITE: "And * * * we'd like to underscore that the labs in question are all mail order laboratories, not the community laboratories that do the bulk of the nation's medical testing. * * * "

B. RADIO BROADCAST OF JUNE 22.

CALMER (introducing the program): "From a CBS NEWS fact-finding team, disclosures on mail order medicine; * * *."
"* * * Today your doctor may take a sample of your blood, urine

or some other medical specimen, air mail it for testing to a mail order laboratory across the country, and receive back a report on the results. Mail order labs, some of them offering cut rates to doctors, operate virtually without state or federal control. * * * "

(Thereafter there followed the same byplay with McMullen and Shaeffer as occurred on Cronkite's telecast.)

C. NEWS RELEASE OF JUNE 23.

"Of medical specimen tests undertaken by mail order medical laboratories throughout the country during a CBS News Fact Finding Unit investigation into the accuracy of mail order labs, 100 per cent of the labs failed to identify two specimens; 88 per cent were wrong in one or more of the tests they undertook."

(There follows a recitation of the test results, in which it is clear that the percentages of error refer to laboratories which participated, not laboratories generally.)

"The accuracy of mail order laboratories was tested because numerous health authorities, including members of the American Medical Association and the College of American Pathologists, have doubted the ability of mail order labs to perform accurately many types of routine laboratory tests, particularly since the specimens involved in these tests are affected by temperature and decompose rapidly during mail shipments."

D. TELECAST OF JUNE 23.

CRONKITE: "Last night, we presented the first in a series of reports on mail order medical laboratories. Our report indicated widespread error among the mail order labs checked by the CBS News Fact Finding Unit. Eighty-eight per cent of those labs were wrong on one or more of the tests they undertook, tests that could involve life or death. That first report involved many lab-

oratories testing actual medical specimens. But tonight's report involves only one lab. * * * "

(There followed a byplay among Cronkite, McMullen and Drs. Shaeffer and Kogon, relating to the detailed investigation of the Nutritional Research—Science Laboratories—Professional Foods nexus. Nutritional Research had sent literature to one of CBS' cooperating physicians, advertising Urine Hormone Assays at a low price. Physicians sent 12 samples of distilled water, colored yellow; these were tested by Science Laboratories, which found hormones of seven different categories. All of its reports suggested low metabolism, and suggested nutritional supplements. Several days later, and in following weeks, representatives of Professional Foods contacted each of the physicians; these representatives received copies of the assays from Nutritional Research. The same man is president of Nutritional Research and owner of Professional Foods.)

CRONKITE: "* * * And how do the mail order labs themselves react to the findings of the CBS News Fact Finding Unit? A laboratory spokesman replies on this program tomorrow night."

E. RADIO BROADCAST OF JUNE 23.

CALMER: "Last evening THE WORLD TONIGHT presented an exclusive report on a CBS News Fact Finding unit investigation of cut-rate mail-order medical laboratories. Many medical authorities have doubted that these labs, virtually without federal or state regulation, can accurately test various types of medical specimines [sic] sent them by doctors. Yet, thousands of doctors use them. In the CBS investigation 87 per cent of the labs were wrong on one or more of the tests they undertook. 100 per cent were wrong on two of the tests. * * * "

TERRY (Surgeon General):

"Well, as a physician I am greatly concerned about the inaccuracies of laboratories as reflected by these studies. I think from two standpoints the Federal Government has a definite concern. * * * Certainly as soon as I can get back to my office we'll study the matter very carefully."

CALMER: "Following last night's disclosures * * * Senator Jacob Javits proposed that Congress pass a bill requiring federal inspection and licensing of medical laboratories which diagnose specimens sent to them through the mails."

F. TELECAST OF JUNE 24.

(Chief Postal Inspector Henry Montague, and Food and Drug Administration Commissioner George Larrick, were interviewed. Both said they were conducting investigations in the general area of the mail-order testing business.)

LARRICK: " * * * I have not been briefed on our most recent investigation in this field * * * which is being stimulated by Mr. McMullen's investigation. And we will, when we conclude the study of that investigation, then reach a conclusion about whether we should recommend additional legislation."

CRONKITE: " * * * The CBS News investigation of mail order medical laboratories has indicated that many firms submitted faulty reports on specimens. But this is not necessarily to be considered an indictment of all laboratories that do business by mail. Many others insist their standards are high, and that mail order medical testing can be reliable. * * * "

WINKELMAN (Medical Consultant at Kings County Research Laboratory in Brooklyn):

(In an interview with Dave Dugan of CBS, Winkelman said that it was "possible" for specimens to deteriorate in the mails, but that "precautions can easily be taken and proper instructions can be given to the doctors who are going to submit their specimens through the mail so as to preserve the stability and the sterility of the specimens * * * especially in the six tests that were described by your office." He said further, "The value of performing laboratory tests through the mail is going to increase in the future. There are many tests that are being done now that are simply beyond the realm of a small, local laboratory." He felt "very strongly" that "laboratories that do their business through the mail have gotten a bad reputation." "The condemnation," he said, "has been in the last two days on Mr. Cronkite's program that the inaccuracy of these results has been due to the fact that the specimens were submitted by the mail. I maintain that tests of specimens submitted by the mail are and can be performed accurately. If accurate results were found in those laboratories listed in the last two days, it was not due to the fact that it was submitted by the mail. The error is due to the laboratory itself.")

CRONKITE: "Our problem, as Jay McMullen pointed out originally, is that many mail order laboratories operate virtually without Government supervision; laws vary widely from state to state, and the quality of laboratory analysis can vary just as widely."

On Petition for Rehearing.

This cause is before the Court on the plaintiff's motion for a rehearing on the defendants' motion for a dismissal, which the Court treated as a motion for a summary judgment, or in the alternative for an order supplementing the record with an affidavit tendered with said motion. The motion was served on the 21st day of September, 1966, which would be the

thirteenth day following the entry of the judgment of dismissal.

Rule 59(a) and (b),[1] F.R.Civ.P., fixes the grounds and the time within which a motion for a new trial may be served in either a trial by jury or a trial by the Court.

■ It has been uniformly held that a petition for a rehearing is, under these rules, in all respects the same as a motion for a new trial. Safeway Stores, Inc. v. Coe, 78 U.S.App.D.C. 19, 136 F.2d 771, 148 A.L.R. 782 (1943); Slater v. Peyser, 91 U.S.App.D.C. 314, 200 F.2d 360 (1952); American Oil Co. v. Carey, 246 F.Supp. 773 (E.D.Mich.S.D.1965).

■ On the showing before me, I find no mistake, inadvertence, excusable neglect nor any other reason which might justify relief under Rule 60(b), F.R.Civ.P. Certainly, I cannot find that the interests of justice require a rehearing. Sternstein v. "Italia"-Societa Per Azioni Di Navigazione-Genoa, 275 F.2d 502 (2d Cir. 1960). For that matter, Rule 60(b) is not intended to serve the same purposes as Rule 59. John E. Smith's Sons Co. v. Lattimer Foundry & Mach. Co., 19 F.R.D. 379 (D.C.), aff'd 239 F.2d 815 (3d Cir. 1956).

■ Aside from the legal roadblock which may be presented by the requirements of Rule 59(a) and (b), the record reveals that counsel for both parties, at the time of submission, stated that the Court had before it all of the evidence on liability that might be presented at the time of trial The record shows that I viewed the films on February 22nd, the last memorandum being received before mid-March, 1966. The opinion and order of dismissal were dated September 8, 1966. Counsel offers no reasonable explanation as to why the additional material could not have been supplied, either before or after submission, or in the lengthy period in which the Court had the matter under submission. I must, therefore, exercise my discretion against granting a rehearing or permitting the plaintiff to supplement the record.

For that matter, I seriously question if the tendered affidavit presents evidence which would, in any way, alter my original opinion.

The motion for a rehearing, and the alternative to supplement the record, is denied.

It is so ordered.

---

1. Rule 59(a) and (b) provides as follows:

"(a) *Grounds*. A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States; and (2) in an action tried without a jury, for any of the reasons for which rehearings have heretofore been granted in suits in equity in the courts of the United States. On a motion for a new trial in an action tried without a jury, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment."

"(b) *Time for Motion*. A motion for a new trial shall be served not later than 10 days after the entry of the judgment. * * *"