United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued April 5, 2002 Decided June 11, 2002 

 No. 01-5050

 Dolly Kyle Browning and 
 Direct Outstanding Creations Corporation, 
 Appellants

 v.

 William Jefferson Clinton, et al., 
 Appellees

 Appeal from the United States District Court 
 for the District of Columbia 
 (No. 98cv01991)

 Larry Klayman argued the cause and filed the briefs for 
appellants.

 David E. Kendall argued the cause for appellee William 
Jefferson Clinton, et al. With him on the brief were Allen P. 
Waxman, Kevin Hardy, Bruce Lindsey, appearing pro se, 
and William C. Oldaker.

 John D. Aldock argued the cause and filed the brief for 
appellee Robert S. Bennett.

 Floyd Abrams and Landis C. Best were on the brief for 
appellee Jane Mayer and Advanced Magazine Publishers Inc.

 Before: Edwards, Rogers and Tatel, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Tatel.

 Tatel, Circuit Judge: In this appeal, we review the district 
court's Rule 12(b)(6) dismissal of eight common and federal 
law claims against former President Clinton, two of his 
lawyers, one of his aides, The New Yorker, and a journalist. 
Construing the complaint liberally and giving appellant the 
"benefit of all inferences that can be derived from the facts 
alleged," Kowal v. MCI Communications Corp., 16 F.3d 1271, 
1276 (D.C. Cir. 1994), we affirm as to all appellees except Mr. 
Clinton; with respect to Mr. Clinton, we affirm the dismissal 
of six claims and reverse two.

 I.

 This case involves appellant Dolly Kyle Browning's "long-
standing friendship" with former President Clinton--a friend-
ship she alleges "included an extramarital, sexual relation-
ship"--and her "semi-autobiographical novel" in which the 
female protagonist has a long-standing extramarital affair 
with the governor of a southern state. Am. Compl. p p 15, 20. 
Browning copyrighted her novel in 1988 and sent it to War-
ner Books, where an editor "encouraged [her] to continue to 
work on [it]." Id. p 22. Thereafter, Browning charges, Clin-
ton and the other appellees engaged in a scheme to prevent 
publication of her book and defame her. According to the 
amended complaint, the scheme involved the following:

 In 1992, Browning's own brother, allegedly at Clinton's 
direction, telephoned to "warn[ ] [Browning], 'if you cooperate 
with the media we will destroy you.' " Id. p 32. Clinton's 
brother also "threaten[ed] [her]" by phone. Id. p 33. The 
following year, appellee Bruce Lindsey, then serving as Depu-
ty White House Counsel, "threatened [ ] Browning by telling 

her sister[,] 'we've read your sister's book and we don't want 
it published.' " Id. p 38.

 In 1994, Browning and Clinton met at their thirtieth high 
school reunion where, according to Browning, Clinton "apolo-
gized to [her] for the threat that had been made against her." 
Id. p 41. Shortly thereafter, Browning's sister and Lindsey, 
acting as intermediaries, reached an "understanding" about 
what Browning could say: She "was permitted to say publicly 
that she and Clinton had a thirty-three year relationship that 
from time to time included sex," but "agreed not to tell the 
true story" and "not to use ... the 'A words' ... adultery 
and affair"; Clinton agreed "not [to] tell any lies about [her]." 
Id. p 44 (internal quotation marks omitted).

 Browning retained a literary agent in the summer of 1995. 
Later that year, Esquire magazine published an article about 
Browning and her book, and in early 1996, Publisher's Week-
ly reported that Browning was "ready to go public in a big 
way via the book business[,] ... assuming, that is, that a 
publisher bites. This month, [Browning's literary agent] will 
begin shopping around a bombshell roman A clef that could 
knock Primary Colors right out of the headlines." Id. p 47 
(internal quotation marks omitted) (first alteration in origi-
nal). In the end, however, Browning received no "positive 
responses, offers to publish, or contracts from any of the 
publishers that she contacted." Id. p 55. Appellant Direct 
Outstanding Creations Corporation, a business created by 
Browning's husband, subsequently "acquired ... rights to 
... the manuscript ... [but] has not been able to sell [those] 
rights to ... any publisher[ ]." Id. p 56.

 Appellee The New Yorker ran an article in 1997 by appellee 
Jane Mayer attributing comments to publisher Alfred S. 
Regnery about "a memoir by a putative Presidential mis-
tress." Id. p 51 (internal quotation marks omitted). Accord-
ing to the article, although "[i]t seemed plausible ... that 
[such] a memoir ... would find a home at Regnery [Publish-
ing Co.][,]" Regnery said he "wouldn't touch [the book] with a 
ten-foot pole" because it wasn't "particularly newsworthy" 
and was "far below [Regnery's] standards." Id. (internal 

quotation marks omitted). Browning claims that she never 
sent her manuscript to Regnery, and that Regnery never 
made these statements.

 In January 1998, Clinton, in connection with his deposition 
in the Paula Corbin Jones litigation, produced a handwritten 
memo summarizing his high school reunion conversation with 
Browning. The memo, which Clinton testified he and appel-
lee Marsha Scott, a White House aide, prepared several days 
after the reunion, states that when Clinton "pointed out that 
[Browning's book] wasn't true, [Browning] said[,] 'well, I'll 
say it's just fiction, just a story[,]' and that she needed the 
money and she didn't care if it hurt me or the presidency, 
that others had made money and she felt abandoned." Id. 
p 69 (internal quotation marks omitted). In his deposition, 
Clinton explained that after writing the first part of the 
memo, he gave it to Scott who read it and added her own 
notes. Id. p 73. Scott's portion reports that Browning "re-
peatedly" stated that "her story was not true but ... she was 
angry and needed money." Id. p 74 (internal quotation marks 
omitted). Time later published excerpts from the memo.

 In March 1998, Jones, in opposition to Clinton's motion for 
summary judgment in that litigation, filed a ninety-page brief 
and 600 pages of exhibits, among which were statements from 
several witnesses, including a four-page affidavit from Brown-
ing describing her alleged affair with Clinton. Appellee 
Robert S. Bennett, Clinton's attorney, appeared on CNN and 
described Jones's filing as "scurrilous." Id. p 80 (internal 
quotations omitted). At a press conference later that month, 
Bennett called Jones's "700-page filing"

 little more than a web of deceit and distortions.... 
 Despite the plaintiff's ... insistence on using her last 
 filing to dump into the media every piece of garbage they 
 can get before the court, we will not respond in kind to 
 that. Despite their vicious and false attacks, our filing 
 focuses on the weaknesses of the plaintiff's case and her 
 witnesses .... Because they dumped so much garbage 
 
 .... we had to move to strike it and to present substan-
 tial evidence ... to rebut that salacious material.
 
Id. p 81.

 Based on the foregoing, Browning asserts eight common 
and federal law claims: (1) tortious interference with prospec-
tive business opportunity (against all appellees); (2) dispar-
agement of property (against The New Yorker and Mayer); 
(3) defamation (against Clinton, Scott, and Bennett); (4) 
"false light" invasion of privacy (against Clinton, Scott, and 
Bennett); (5) intentional infliction of emotional distress 
(against Clinton, Lindsey, Scott, and Bennett); (6) civil RICO 
(against Clinton and Lindsey); (7) Bivens liability for viola-
tion of the First Amendment (against Clinton and Lindsey); 
and (8) civil conspiracy (against all appellees). Concluding 
that Browning failed to state a claim with respect to each 
count and denying leave to amend, the district court dis-
missed the complaint with prejudice under Federal Rules of 
Civil Procedure 12(b)(6) and 15(a). Browning appeals.

 II.

 A Rule 12(b)(6) motion tests the legal sufficiency of a 
complaint: dismissal is inappropriate unless the "plaintiff can 
prove no set of facts in support of his claim which would 
entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 
(1957). Reviewing de novo, Moore v. Valder, 65 F.3d 189, 192 
(D.C. Cir. 1995), we accept the plaintiff's factual allegations as 
true and construe the complaint "liberally," "grant[ing] plain-
tiff[ ] the benefit of all inferences that can be derived from the 
facts alleged," Kowal, 16 F.3d at 1276. At the Rule 12(b)(6) 
stage, we do not assess "the truth of what is asserted or 
determin[e] whether a plaintiff has any evidence to back up 
what is in the complaint." ACLU Found. of S. Cal. v. Barr, 
952 F.2d 457, 467 (D.C. Cir. 1991). As the Supreme Court 
reiterated in a case decided after the district court dismissed 
this case, Federal Rule of Civil Procedure 8 requires "simply 
[that] ... 'the defendant [give] fair notice of what the plain-
tiff's claim is and the grounds upon which it rests.' This 
simplified notice pleading standard relies on liberal discovery 

rules and summary judgment motions to define disputed facts 
and issues and to dispose of unmeritorious claims." Swier-
kiewicz v. Sorema N.A., 534 U.S. 506, ___, 122 S. Ct. 992, 998 
(2002) (quoting Conley, 355 U.S. at 47). That said, we accept 
neither "inferences drawn by plaintiffs if such inferences are 
unsupported by the facts set out in the complaint," nor "legal 
conclusions cast in the form of factual allegations." Kowal, 16 
F.3d at 1275; cf. 5A Charles Alan Wright & Arthur R. 
Miller, Federal Practice and Procedure s 1357, at 347-48 
(2d ed. 1990) (explaining that Rule 12(b)(6) dismissal is appro-
priate where the allegations contradict the claim asserted, 
e.g., where the allegations in an action for negligence showed 
that the plaintiff's own negligence was the sole proximate 
cause of the injury).

 With these standards in mind, we begin with Browning's 
allegation that appellees "intentionally ... [and] maliciously 
... interfered with" her business opportunity to publish her 
novel. Am. Compl. p 91. To survive a motion to dismiss on 
this claim, Browning must plead "(1) the existence of a valid 
business relationship or expectancy, (2) knowledge of the 
relationship or expectancy on the part of the interferer, (3) 
intentional interference inducing or causing a breach or ter-
mination of the relationship or expectancy, and (4) resultant 
damage." Bennett Enters. v. Domino's Pizza, Inc., 45 F.3d 
493, 499 (D.C. Cir. 1995). The first element--business expec-
tancy--must be "commercially reasonable to anticipate." 
Whelan v. Abell, 953 F.2d 663, 673 (D.C. Cir. 1992) (internal 
quotation marks and citation omitted). Although Browning's 
allegation that she "had a reasonable expectation" of selling 
her book to a publisher, Am. Compl. p 88, might, standing 
alone, fall short, she also alleges not only that a Warner 
Books editor "encouraged" her to continue working on the 
book, id. p 22 (appellees mischaracterize Warner's response 
as an unequivocal "reject[ion]," Clinton Appellees' Br. at 4), 
but also that she received favorable press coverage in the 
Esquire and Publisher's Weekly articles. Indeed, the latter 
described her novel as a "bombshell" that "could knock 
Primary Colors right out of the headlines.' " Am. Compl. 
p 47. Reading the complaint liberally in Browning's favor 

and bearing in mind that discovery and summary judgment 
motions, not Rule 12(b)(6) dismissals, are the appropriate 
vehicles for weeding out unmeritorious claims, see Swierkiew-
icz, 534 U.S. at ___, 122 S. Ct. at 998, we think these 
allegations, though thin, could support an inference that it 
was "commercially reasonable [for Browning] to anticipate" 
selling the book. Whelan, 953 F.2d at 673 (internal quotation 
marks and citation omitted). We certainly understand how 
the district court could have concluded that the lack of 
responses from publishers "contradicted" the reasonableness 
of any such expectation, Browning v. Clinton, No. 98-1991, 
slip op. at 15 (D.D.C. Feb. 8, 2001), but Browning theorizes 
that no one responded because "Clinton, acting individually 
and through various agents, ... threaten[ed] ... potential 
publishers," Am. Compl. p 50.

 Insisting that we should nevertheless affirm the dismissal 
of the tortious interference claim, three appellees--Clinton, 
Lindsey, and Scott--argue that Browning failed to plead 
another element of the claim, i.e., causation. It "defies logic," 
they say, to conclude that Clinton and others caused publish-
ers "with a wide range of political beliefs" to reject the book. 
Clinton Appellees' Br. at 6. At the Rule 12(b)(6) stage, 
however, we must give Browning the benefit of all inferences 
and confine our analysis to the facts alleged. The amended 
complaint neither identifies publishers she contacted nor 
characterizes their "political beliefs." Whether a triable issue 
of fact exists regarding her allegation that "potential publish-
ers" failed to respond positively due to "threat[s]" from 
Clinton and his "agents" is a question for summary judgment.

 We are equally unpersuaded by these appellees' argument 
that Browning failed to plead still another element, i.e., 
intentional interference. Browning cannot rely on her allega-
tion that Clinton and his "agents" "threaten[ed] ... potential 
publishers," they say, because in failing to specify statements, 
publishers, or times, the allegation is too "conclusory." Id. at 
5. Though extremely general and based only "on information 
and belief," Am. Compl. p 50, the allegation satisfies Rule 8 as 
to Clinton (like the parties, we read the word "agents," when 
used in connection with alleged threats to publishers, to 

include neither Lindsey nor Scott nor any other appellee). 
The allegation gives "fair notice of what [Browning's] claim is 
and the grounds upon which it rests." Swierkiewicz, 534 U.S. 
at ___, 122 S.Ct. at 997 (internal quotation marks and citation 
omitted). By signing the complaint, moreover, Browning's 
counsel affirmed (on pain of sanctions) that he made "reason-
able inquiry" into the facts supporting the complaint. See 5 
Wright & Miller, s 1224, at 205 (explaining that pleading 
"on information and belief" is appropriate unless special 
pleading requirements apply or the information is within the 
plaintiff's knowledge, and noting the relationship between this 
permissive standard and Rule 11(b)'s requirement that the 
attorney who signs the pleadings affirms having made "rea-
sonable inquiry" into the allegations).

 These three appellees also argue that Browning cannot rely 
on the alleged threats to intimidate her into not publishing 
her story because her claim requires conduct that induced 
third parties--here, potential publishers--to decline a busi-
ness relationship. The Restatement of Torts, upon which 
appellees rely, actually defines tortious interference more 
broadly, including conduct that "prevent[s] the [plaintiff] from 
acquiring or continuing the prospective relationship" in addi-
tion to conduct that "induc[es] or otherwise caus[es] a third 
person not to enter into or continue the prospective relation." 
Restatement (Second) of Torts s 766B (1977). The amended 
complaint, however, alleges that after (and therefore despite) 
the threat Browning made concerted efforts to sell her 
book--thus contradicting any basis for her claim other than 
interference with third parties. Although the amended com-
plaint's allegations against Clinton and Scott are not limited 
to actions directed at Browning, this is not the case as to 
Lindsey. The only allegations against him are that he threat-
ened Browning and, on Clinton's behalf, negotiated the "un-
derstanding" with her. We will therefore affirm the dismissal 
of this claim against Lindsey.

 The claim against Scott also fails, but on statute of limita-
tions grounds. The amended complaint alleges that in 1994, 

Scott added notes to the memo describing Browning's en-
counter with Clinton at their high school reunion, and that 
Scott showed those notes to Clinton--conduct Browning char-
acterizes as defamatory, and which forms the sole basis for 
her tortious interference claim against Scott. This tortious 
interference claim is therefore "intertwined" with Browning's 
defamation claim. See Mittleman v. United States, 104 F.3d 
410, 415-17 (D.C. Cir. 1997) (holding that a claim is "inter-
twined" with another claim when they are based on the same 
underlying facts). When a cause of action with no prescribed 
statute of limitations is "intertwined" with one having a 
prescribed limitations period, District of Columbia courts 
apply the prescribed period. See id. at 415-16. In the 
District of Columbia, tortious interference with business ex-
pectancy claims have no prescribed statute of limitations, so 
we must apply the one-year statute for defamation. See D.C. 
Code s 12-301(4) (West 2001). Because Scott's conduct oc-
curred more than a year before Browning filed her complaint, 
we will affirm the dismissal of the tortious interference claim 
against Scott. By contrast, the tortious interference claim 
against Clinton is not "intertwined" with Browning's defama-
tion claim. Browning alleges that Clinton and his unidentified 
"agents" intentionally interfered with her business opportuni-
ty through conduct other than defamation--including by 
threatening publishers.

 Appellee Bennett urges us to affirm the dismissal of 
Browning's tortious interference claim against him because 
his CNN and press conference statements, the only conduct 
Browning alleges he engaged in, could not have "hindered her 
ability to publish her book." Appellee Bennett's Br. at 12. 
Even given the liberal reading owed pleadings, we agree. 
Made two years after Browning and her agent contacted 
publishers, Bennett's comments focused on what he called 
"salacious," "scurrilous," and "deceit[ful]" filings by Jones. 
Am. Compl. p p 80, 81. Those filings included a Browning 
affidavit describing her alleged relationship with Clinton. 
But even if a listener familiar with the circumstances of the 
Jones case could infer that Bennett's language applied to 
Browning, see infra pp. 14-15, their timing and content make 

the necessary causal inference "unsupported by the facts set 
out in the complaint." Kowal, 16 F.3d at 1275. We will 
therefore affirm the dismissal of the tortious interference 
claim against Bennett.

 The final two appellees, The New Yorker and Jane Mayer, 
argue that Browning cannot show that Mayer's article "inter-
fered with Browning's longstanding and unsuccessful prior 
efforts to publish her novel ... [since] 1988," pointing out 
that the article "profiled a publisher[,] ... did not focus on 
Browning or her novel[,] [and] ... did not even mention 
Browning or the novel by name." The New Yorker Appellees' 
Br. at 13. Although we think these appellees overstate their 
case when they characterize Browning's efforts as "unsuc-
cessful ... since 1988"--after all, the Warner Books editor 
"encouraged" her, Am. Compl. p 22--we agree that in view of 
the content of Mayer's article, the relationship between the 
article and any publisher's failure to buy Browning's book is 
too attenuated for her to have successfully pleaded causation. 
We will therefore affirm the dismissal of this claim against 
The New Yorker and Mayer.

 The foregoing leaves the tortious interference claim intact 
against Mr. Clinton only. We will therefore reverse the 
dismissal of that claim and remand for further proceedings. 
This requires that we also reverse the dismissal of the 
common law civil conspiracy claim against Mr. Clinton. In 
dismissing this claim, the district court relied on its conclu-
sion that Browning failed to plead an underlying tort. See 
Halberstam v. Welch, 705 F.2d 472, 479 (D.C. Cir. 1983) 
(holding that civil conspiracy is not a separate cause of action, 
but rather a means of establishing liability for underlying 
torts). We have determined, however, that Browning has 
stated a tortious interference claim against Mr. Clinton, and 
he offers no basis for affirmance other than the absence of an 
underlying tort. As to the other appellees, however, we will 
affirm the dismissal of the civil conspiracy claim because, as 
we indicate below, Browning has failed to allege an underly-
ing tort against any of them.

 III.

 We agree with the district court that Browning's remaining 
claims cannot survive Rule 12(b)(6) review. We explain each 
in turn.

 As support for her disparagement of property claim against 
The New Yorker and Mayer, Browning relies on the article 
reporting Regnery's negative comments. A disparagement of 
property claim requires that the plaintiff plead "special dam-
ages," Fowler v. Curtis Publ'g Co., 182 F.2d 377, 378 (D.C. 
Cir. 1950), that is, "pecuniary harm resulting from the defen-
dant's unprivileged publication of false statements, with 
knowledge or reckless disregard of the falsity, concerning the 
plaintiff's property or product," Art Metal-U.S.A., Inc. v. 
United States, 753 F.2d 1151, 1155 n.6 (D.C. Cir. 1985). 
Fedral Rule of Civil Procedure 9(g) requires that special 
damages be "specifically stated," i.e., the plaintiff must allege 
actual damages with "particularity" and specify " 'facts show-
ing that such special damages were the natural and direct 
result' " of the defendant's conduct (here, the alleged false 
and disparaging article). Fowler, 182 F.2d at 379 (quoting 
Erick Bowman Remedy Co. v. Jensen Salsbery Labs., 17 F.2d 
255, 261 (8th Cir. 1926)). This heightened pleading standard 
applies because "special damages," unlike general damages, 
are "not the necessary consequence of [the] defendant's con-
duct, [but] stem from the particular circumstances of the 
case." 5 Wright & Miller, s 1310, at 700. A plaintiff can 
satisfy this pleading obligation by identifying either particular 
customers whose business has been lost or facts showing an 
established business and the amount of sales before and after 
the disparaging publication, along with evidence of causation. 
See Art Metal-U.S.A., 753 F.2d at 1155 n.6 (explaining the 
type of allegations required to plead special damages); cf. 
Fowler, 182 F.2d at 379 (affirming a dismissal for failure to 
plead special damages where the plaintiffs alleged only that 
"as a result of the malicious publication" they lost a total 
dollar amount of business).

 Browning's amended complaint states that "[a]s a proxi-
mate result of the publication of [Mayer's article], ... neither 

[ ] Browning nor Direct Outstanding Creations Corporation 
were [sic] able to sell the publishing and other rights in the 
manuscript," and therefore that they suffered damages "in-
cluding but not limited to marketing and other business 
expenses incurred ..., loss of goodwill, [and] emotional dis-
tress and mental anguish." Am. Compl. p p 96, 95. Accord-
ing to Browning, these allegations satisfy Rule 9(g) because 
they "notify the defendant as to the nature of the claimed 
damages." Appellant's Br. at 19. Amplifying this point at 
oral argument, counsel insisted that "the standard of pleading 
special damages has been relegated to notice pleading." Tr. 
of Oral Arg. at 10. We find no support for this proposition. 
Indeed, it runs counter to the very case Browning cites, 
Schoen v. Washington Post, which expressly requires that 
disparagement of property claims set forth "the precise na-
ture of the losses as well as the way in which the special 
damages resulted from the allegedly false publication." 246 
F.2d 670, 672 (D.C. Cir. 1957). The plaintiff in Schoen 
specified his business receipts before and after defendant's 
disparaging publication, alleged that the publication caused 
"many customers to withdraw their custom," and identified 
three such customers. Id. Browning's amended complaint 
contains no allegations remotely like those in Schoen. She 
neither quantifies her loss nor identifies any lost business 
relationships. She alleges no facts suggesting causation. 
While it may not be "necessary ... to provide ... the 
maximum degree of detail that plaintiff might be capable of 
providing," Appellant's Br. at 19 (internal quotation marks 
and citation omitted) (emphasis added), Browning merely 
asserts in general terms that The New Yorker article cost her 
financially. We agree with the district court that Rule 9(g) 
requires more.

 Browning alleges three separate defamatory acts by Clin-
ton and one each by Scott and Bennett. For her first claim 
against Clinton, she asserts that the 1994 memo he and Scott 
prepared was defamatory and that Clinton "published" it 
when he showed his notes to Scott. See Croixland Ltd. 
Props. v. Corcoran, 174 F.3d 213, 215-16 (D.C. Cir. 1999) 
(explaining the publication requirement for a defamation 

claim). The district court found the memorandum protected 
by both the "common interest" and the "conditional[ ] ... 
common law" privileges. Browning, No. 98-1991, slip op. at 
18. Browning appeals only the latter, so we will affirm based 
on the former. See Corson & Gruman Co. v. NLRB, 899 
F.2d 47, 50 n.4 (D.C. Cir. 1990) (holding that an appellant 
waives an issue not argued in brief). Because her claim 
against Scott also concerns the 1994 memo, and because 
Browning also fails to challenge the district court's "common 
interest" finding with respect to Scott, we will affirm that 
portion of the district court's order as well.

 Browning next claims that Clinton defamed her by produc-
ing the 1994 memo in the Jones litigation and then testifying 
about it in his deposition. "[S]tatements preliminary to or in 
the course of a judicial proceeding," however, enjoy an "abso-
lute privilege" "so long as the defamatory matter has some 
relation--a standard broader than legal relevance--to the 
proceeding." Finkelstein, Thompson & Loughran v. Hemis-
pherx Biopharma, Inc., 774 A.2d 332, 338 (D.C. 2001) (inter-
nal quotation marks and citations omitted). According to 
Browning, Clinton's production of the memo was "not inciden-
tal to any judicial proceeding," but, rather, Clinton gratu-
itously "use[d] the judicial system in furtherance of his 
scheme to defame [ ] Browning." Appellant's Br. at 25, 29. 
She points to Jones's first set of document requests, the 
responses to which, Browning contends, did not include her 
affidavit. Unmentioned by Browning, however, Clinton's re-
sponse to Jones's second set of document requests indicates 
that Jones actually sought "all documents created in or 
relating to the time from May 8, 1986 to the present concern-
ing Dolly Kyle Browning," and that Clinton "produced all 
documents responsive to this request." Resp. to Pl.'s Second 
Set of Doc. Reqs. at 19. Because Clinton's production of 
Browning's affidavit thus "ha[d] some relation" to the Jones 
litigation, Finkelstein, 774 A.2d at 338 (internal quotation 
marks and citation omitted), it is, as the district court found, 
absolutely privileged.

 Browning contends that Time's publication of excerpts 
from the 1994 memo amounted to another defamatory act by 
Clinton. The amended complaint, however, nowhere links 

Clinton to the Time publication. Instead, the amended com-
plaint vaguely alleges that "[o]n information and belief, Clin-
ton ... published [the] memorandum to other individuals." 
Am. Compl. p 75. Browning has thus failed to plead a critical 
element of defamation, i.e., that Clinton "published" the de-
famatory statement. See Croixland, 174 F.3d at 215.

 The defamation claim against Bennett rests on his press 
statements about Jones's filing. To survive a Rule 12(b)(6) 
motion, Browning must allege that Bennett's statements 
"concern[ed]" her--that is, that a "reasonable listener" could 
think that Bennett was referring to Browning even though he 
never named her--and that the comments were defamatory. 
Id. When a statement refers to a group, a member of that 
group may claim defamation if the group's size or other 
circumstances are such that a reasonable listener could con-
clude the statement referred to each member or "solely or 
especially" to the plaintiff. Serv. Parking Corp. v. Wash. 
Times Co., 92 F.2d 502, 506 (D.C. Cir. 1937) (internal quota-
tion marks and citation omitted); see also Restatement (Sec-
ond) of Torts s 564A (1977) ("[G]eneral[ly] ... no action lies 
for ... defamatory words concerning a large group or class of 
persons," but it may when "the words are ... reasonably 
understood to have personal application ... [based on the] 
circumstances[.]"). Insisting that she successfully alleged 
this element, Browning points out that Bennett's statements 
refer to Jones's court filings, which included Browning's 
affidavit, and to Jones's "witnesses," of which Browning was 
one. "Bennett," Browning asserts, "was plainly accusing 
[me] of criminal conduct--perjury." Appellant's Br. at 35.

 According to Bennett, because he described Jones's filings 
in their totality, emphasizing their voluminous nature--a 
"700-page filing"--no reasonable person could think his state-
ment applied to Browning's four-page affidavit. Although 
that may be true generally, a listener who knew Jones's filing 
contained the Browning affidavit might well believe that 
Bennett's reference to Jones's "witnesses" pertained to each 
witness, including Browning. See Restatement (Second) of 
Torts s 564 cmt. b (1977) ("If the applicability of the defama-

tory matter to the plaintiff depends upon extrinsic circum-
stances, it must appear that some person ... familiar with 
the circumstances ... [could] reasonably believe[ ] that [the 
statement] referred to the plaintiff."). We need not resolve 
this issue, however, for we believe that no reasonable person 
would be able to infer that Bennett was accusing Browning of 
deceitfulness, let alone perjury. Bennett aimed his words of 
falsehood--"web of deceit and distortions," "vicious and 
false"--at Jones's entire "700-page" filing. Am. Compl. p 81. 
By contrast, when Bennett expressly mentioned "witnesses" 
(again, this included Browning), he spoke merely of their 
"weaknesses." Id. Given the hotly contested and high pro-
file nature of the Jones litigation, Bennett's other allegedly 
defamatory words--"scurrilous," "garbage," "salacious"--
amount only to non-actionable "hyperbole." See Moldea v. 
New York Times Co., 22 F.3d 310, 313 n.2, 314 (D.C. Cir. 
1994) (holding that "hyperbole" is protected from defamation 
claims due to the "constitutional protection afforded to paro-
dy, satire, and other imaginative commentary," and explain-
ing the "importance of context" in identifying hyperbole); see 
also, e.g., Nat'l Assoc. of Letter Carriers v. Austin, 418 U.S. 
264, 286 (1974) (calling a strikebreaker a "traitor to his 
country" was "merely rhetorical hyperbole").

 Browning's false light invasion of privacy claim rests on the 
same facts as her defamation claim. We will therefore affirm 
the dismissal of that claim as well. See White v. Fraternal 
Order of Police, 909 F.2d 512, 518 (D.C. Cir. 1990) (holding 
that the privileges and defenses applicable to a defamation 
claim apply to a false light claim based on the same facts).

 We turn next to Browning's charge of intentional infliction 
of emotional distress by Clinton, Bennett, Scott, and Lindsey. 
This tort requires conduct so " 'outrageous in character, and 
so extreme in degree, as to go beyond all possible bounds of 
decency, and to be regarded as atrocious, and utterly intoler-
able in a civilized community.' " Bernstein v. Fernandez, 649 
A.2d 1064, 1075 (D.C. 1991) (quoting Restatement (Second) of 
Torts s 46 cmt. d (1965)). Liability requires more than 
"mere insults, indignities, threats, annoyances, petty oppres-

sions, or other trivialities." Homan v. Goyal, 711 A.2d 812, 
818 (D.C. 1998) (internal quotation marks and citation omit-
ted). As the two cases Browning cites demonstrate, the tort 
is reserved for truly outrageous behavior. In one case, the 
defendant gave the plaintiff's home address to a third person 
who the defendant should have expected would harass and 
even threaten the plaintiff's life. See id. at 818-20. In the 
other case, a landlord not only tolerated unsafe and unsani-
tary conditions in his rental properties, but when tenants 
organized a rent strike, hired workers who harassed and 
intimidated the tenants, even "brandish[ing]" firearms. Jon-
athan Woodner Co. v. Breeden, 665 A.2d 929, 934-35 (D.C. 
1995). Browning's allegations are not at all comparable.

 In support of her intentional infliction of emotional distress 
claim against Bennett, Browning again relies on Bennett's 
statements at the press conference. In our view, however, no 
reasonable jury could find terms like "scurrilous" and "gar-
bage," uttered during politically charged litigation, to "go 
beyond all possible bounds of decency." Ordinary Washing-
ton press conferences would otherwise routinely invite litiga-
tion.

 Browning's claim against Clinton relies on the threats she 
alleges were conveyed through Lindsey and others, the nego-
tiations culminating in the "understanding" that she would 
"not use 'the A words' " and that Clinton would not "tell lies 
about her," and Clinton's creation of the 1994 memo and its 
production in the Jones litigation. Yet no reasonable jury 
could conclude that either the threats or the "A word" 
"understanding," disturbing as they may have been to Brown-
ing, amounted to conduct "utterly intolerable in a civilized 
community." Id.; cf. McConathy v. Dr. Pepper/Seven Up 
Corp., 131 F.3d 558, 564 (5th Cir. 1998) (holding that a 
plaintiff failed to state an emotional distress claim against her 
supervisor, who, when the plaintiff sought time off to have 
surgery, "threatened to fire her," and made comments de-
scribed by the court as "cruel" and "unfair"). And certainly 
no reasonable jury could find that Clinton acted "outrageous-

ly" by privately meeting with an aide to prepare a memoran-
dum (even an allegedly false one), and then producing it in 
response to a discovery request. Because the allegations 
against Clinton encompass Scott's and Lindsey's behavior, 
Browning's emotional distress claims against them fail as 
well.

 Browning's civil RICO claim alleges that Clinton and Lind-
sey violated the RICO statute by "acquir[ing]," "maintain[ing] 
control of," and "conduct[ing]" "the affairs" of the Office of 
the President through a "pattern of racketeering activity," 18 
U.S.C. s 1962(b), (c), directed at concealing Clinton's extra-
marital relationships (including with Browning). She also 
accuses appellees of "conspir[ing]" to engage in this pattern 
of racketeering. Id. s 1962(d). Browning alleges a series of 
racketeering activities: threats intended both to deter her 
from revealing her story and to frighten her into agreeing to 
the "A word" "understanding" (in violation of the Hobbs Act, 
id. s 1951); interstate telephone calls to negotiate the "un-
derstanding," with which she says Clinton had no intention of 
complying, and to secure the publication of The New Yorker's 
allegedly disparaging article (in violation of the wire fraud 
statute, id. s 1343); and Clinton's allegedly false Jones testi-
mony (in violation of the obstruction of justice statute, id. 
s 1503). Because of these "racketeering activities," Brown-
ing claims, she suffered "injury to [her] business and proper-
ty." Am. Compl. p 135; see 18 U.S.C. s 1964(c) (authorizing 
a civil damages suit by "[a]ny person injured in his business 
or property by reason of a [RICO] violation").

 Construing Browning's amended complaint to allege injury 
by a scheme to intimidate her into keeping her story secret--
that is, foregoing her "property right ... to market and sell 
any description of her long-standing relationship with Clin-
ton"--the district court found this claim barred by the four-
year statute of limitations for civil RICO claims because, 
although Browning alleges receiving threats back to 1992, she 
did not sue until September 1998. Browning, No. 98-1991, 
slip op. at 20-22. On appeal, Browning claims (as she also 

did in the district court) that her injury was her "[in]ability to 
market and publish [her] book," Appellant's Br. at 55, an 
injury she claims to have discovered no earlier than "the 
Spring of 1996," when she began "attempting to find a 
publisher," id. at 49. Stated this way, her civil RICO claim 
still fails. Putting aside whether the alleged conduct violates 
the cited criminal statutes and therefore constitutes racke-
teering activity, see 18 U.S.C. s 1961 (listing crimes qualify-
ing as acts of racketeering), Browning pleads no facts sug-
gesting "some direct relation between the injury asserted and 
the injurious conduct alleged"--in other words, proximate 
causation, Holmes v. Secs. Investor Prot. Corp., 503 U.S. 258, 
268 (1992) (internal quotation marks and citation omitted). 
Although the threats and telephone calls leading to the "A 
word" agreement bear on Browning's charge that Clinton and 
Lindsey frightened her into not revealing her story, they have 
nothing to do with the failure of any publisher to buy her 
novel. Similarly, the relationship between any evaporation of 
interest in Browning's book and the publication of The New 
Yorker article is "too remote." Id. at 269. Equally unper-
suasive is Browning's claim that Clinton's allegedly false and 
"defamatory" Jones testimony "injure[d] [her] ability to mar-
ket ... [her] book," Appellant's Br. at 55, for no factual 
allegations support this utterly conclusory contention. Link-
ing the alleged racketeering activity with her claimed injury 
requires, as the district court observed, "a huge leap in logic." 
Browning, No. 98-1991, slip. op. at 23.

 Browning's Bivens claim, asserted against Clinton and 
Lindsey, alleges violation of her First Amendment rights 
because Clinton, acting through Lindsey: (1) "threaten[ed] 
[her] if she spoke publicly" about her relationship with Clin-
ton; and (2) "forced [her]," by "threatening to defame her," 
not to use the words "adultery" or "affair" to describe that 
relationship. Am. Compl. p p 138, 139 (internal quotation 
marks omitted). Critical to a successful Bivens claim, of 
course, Clinton and Lindsey must have acted "under color of 
[federal] authority." Bivens v. Six Unknown Fed. Narcotics 

Agents, 403 U.S. 388, 389 (1971). Browning theorizes that as 
"officials at the highest level of the federal government," they 
"used [their] office[s]" to "threaten and intimidate" her. Ap-
pellant's Br. at 57. "All actions of a government official," 
however, "are not, simply by virtue of the official govern-
ment's employ, accomplished under the color of ... law." 
Johnson v. Knowles, 113 F.3d 1114, 1117-18 (9th Cir. 1997) 
(affirming a 12(b)(6) dismissal of a section 1983 suit against a 
state legislator because the defendant's actions were related 
to his role as a member of his political party, not to his 
position as an elected official, and therefore he was not acting 
under color of state law) (internal quotation marks and cita-
tion omitted). To be "under color of authority," the conduct 
must be "cloaked with official power [and the official must] 
purport[ ] to be acting under color of official right." Lopez v. 
Vanderwater, 620 F.2d 1229, 1236 (7th Cir. 1980) (holding 
that a state court judge's preparation of a criminal complaint 
against the defendant, and presentation of those charges to 
himself, were actions taken under color of state law). As the 
district court found, Browning alleges no facts suggesting 
that Clinton and Lindsey purported to act under color of 
official right, or in other words, that their alleged threats 
(including to defame her) reflected anything more than a 
private dispute. See Gritchen v. Collier, 254 F.3d 807, 812-13 
(9th Cir. 2001) (holding that a police officer's threat to bring a 
defamation suit did not constitute action under color of law 
because "[p]ursuing private litigation [was] not abuse [of the 
officer's] position or authority as a police officer"). Conclud-
ing otherwise would entirely eviscerate the "under color of 
authority" requirement.

 Finally, Browning's counsel asserted at oral argument that 
the district court erred by dismissing the amended complaint 
with prejudice. Because that argument appears nowhere in 
Browning's brief, however, we will not consider it. See 
Corson, 899 F.2d at 50 n.4.

 IV.

 In sum, we: (1) affirm the dismissal of the amended 
complaint against all appellees except former President Clin-

ton; (2) affirm the dismissal of the defamation, false light 
invasion of privacy, intentional infliction of emotional distress, 
civil RICO, and Bivens claims against Mr. Clinton; and (3) 
reverse the dismissal of the intentional interference with 
business opportunity claim against Mr. Clinton (and the 
related common law civil conspiracy claim) and remand for 
further proceedings. With respect to the latter causes of 
action, we emphasize that given the generous reading due 
complaints at this stage, we find only that Browning has 
stated a claim upon which relief could be granted. Assuming 
the district court determines that it either has diversity 
jurisdiction over the remaining common-law claims, see 28 
U.S.C. s 1332, or that it should retain supplemental jurisdic-
tion, see id. s 1367(c)(3), whether Browning can then survive 
summary judgment or ultimately prevail depends on whether 
she is able to produce evidence to support her allegation that 
Mr. Clinton intentionally interfered with her "commercially 
reasonable expectation" of publishing her book. Proceedings 
in the district court must concern this narrow issue only. 
The Federal Rules of Civil Procedure give the district court 
all the authority it needs to prevent the use of discovery for 
unrelated purposes.

 So ordered.